# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| | ) Case No. 15-cv-10972 |
| v. | )<br>) Judge Robert M. Dow, Jr. |
| AC CHICAGO, LLC, GREAT LAKES REPAIR, INC., and PAUL D. SCHULZ, | )<br>)<br>) |
| Defendants, | )<br>)<br>) |
| AC CHICAGO, LLC and PAUL D. SCHULZ, | )<br>) |
| Counter-Plaintiffs, | )<br>) |
| v. | )<br>) |
| ATLANTIC SPECIALTY INSURANCE COMPANY, | )<br>)<br>) |
| Counter-Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Atlantic Specialty Insurance Co. seeks a declaration that it has no duty to defend Defendants AC Chicago, LLC ("ACC"), Great Lakes Repair, Inc., and Paul D. Schulz in the underlying lawsuit. Defendants ACC and Schulz bring counterclaims seeking a declaratory judgment that they are entitled to coverage under the insurance policy at issue, alleging that Plaintiff breached the insurance contract, and requesting sanctions under § 155 of the Illinois Insurance Code. Before the Court are Plaintiff's motion for summary judgment [32], and Defendant's motion for summary judgment [35]. For the reasons that follow, the Court grants Plaintiff's motion for summary judgment [32] and denies Defendant's motion for summary

judgment [35]. The Court will enter a final judgment and close the case.

I.  **Background**

The following facts are drawn primarily from the parties' Local Rule 56.1 statements, [34], [37], [40], and [42]. This action is an insurance coverage dispute. Plaintiff is an insurance company incorporated in New York with its principal place of business in Minnesota. [34, at ¶ 1.] Defendant ACC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Defendant Schulz is one of three members of ACC, along with Ryan Weber and Joe Rickard. [*Id.*, at ¶ 2.] Defendant Great Lakes Repair is a Michigan corporation with its principal place of business in Bridgman, Michigan. [*Id.*, at ¶ 3.]

A.  **The Marine Insurance Policy**

The business of ACC was to purchase two America's Cup Class sailboats and provide corporate charters, team building, client entertainment, and America's Cup racing experience to the general public. [37, at ¶ 2.] One of these sailboats was the *Stars & Stripes* ("the vessel"). Weber of ACC contacted an insurance broker, George Lindley of DKS Marine Insurance, to obtain a quote for marine insurance. [*Id.*, at ¶ 10.] Lindley requested via email "a description of the exposure, *i.e.* operation location, navigation limits, etc." [*Id.*] Weber responded "we are looking at staying within five miles of shore during normal conditions from the north part of the city at about Irving Park Road all the way south to 31st Street Harbor." [*Id.*] ACC then submitted an insurance application to Plaintiff through its insurance broker, Lindley. [34, at ¶ 8.] The insurance application requested the following navigation limits: "10 Miles North & 5 Miles East of 31st Street Harbor, Chicago."[1] [*Id.*, at ¶ 12; see also 32-2, at 48 (ACC Insurance

---

[1] ACC denies that it "requested" these navigation limits, arguing that Weber was speaking "in general terms" when responding to Lindley's question. However, Weber's subjective intent when discussing the requested navigation limits with ACC's insurance broker or any miscommunication between Weber and the insurance broker does not change the fact that the insurance application specifically stated that the

2

Application).]

Plaintiff's underwriter, David C. Richardson, reviewed the ACC application and evaluated the risk of insuring ACC. [34, at ¶ 13.] During his assessment of the ACC application, Richardson reviewed a nautical chart for Lake Michigan's Chicago shoreline area to identify any potential marine hazards within the navigation limits that ACC requested, as well as in the surrounding area. [*Id.*, at ¶ 14.] Richardson noticed that there were shoals approximately one mile south of 31st Street Harbor, the home port where the vessel was to be located when not in operation. [*Id.*, at ¶ 15.] A shoal is a submerged ridge, bank, or bar that rises from the bed of a body of water to near the surface and often contains a danger to navigation. [*Id.*, at ¶ 16.] The only entrance to 31st Street Harbor allowing ingress and egress from the harbor opens to the south. [37, at ¶ 5.] Richardson determined, however, that the shoals were outside of the requested navigation limits. [*Id.*, at ¶ 15.] Recognizing the shoals as a risk, Plaintiff requested that ACC provide the sailing resumes of the captains who would be operating the vessel. [34, at ¶ 17.] In fact, Plaintiff's quote of insurance to ACC was made specifically subject to Plaintiff's receipt of the captains' resumes before the vessel was to be placed in operation. [*Id.*] Plaintiff requested this information to determine whether the captains were familiar with Lake Michigan and the waters around Chicago, including the area where the shoals were located. [*Id.*]

Based on the information contained in the ACC application, Plaintiff quoted and issued the marine policy to ACC, with a policy period of February 6, 2015 to February 6, 2016. [*Id.*, at ¶ 18.] Subject to all of its terms, conditions, limitations and exclusions, the policy provided Hull & Machinery coverage in the amount of the vessel's insured value of $200,000, subject to a $20,000 deductible. [*Id.*, at ¶ 19.] The policy also provided Protection & Indemnity coverage, with a limit of liability in the amount of $1,000,000, subject to a deductible in the amount of

---

navigation limits would be "10 Miles North & 5 Miles East of 31st Street Harbor, Chicago."

$5,000 for personal injury and $5,000 for property damage. [*Id.*, at ¶ 20.]

The policy contains a Navigation Condition, which requires that the vessel be confined to a specific navigational area in order for the policy's coverage to apply. The Navigation Condition states:

> It is hereby agreed that it is a condition of the policy that the insured vessel be confined to ten (10) miles North and five (5) miles East of 31st Street Harbor in Chicago, IL when vessels are operated May 1 to October 21 each year.
>
> * * *
>
> In the event of breach of any condition, coverage shall immediately terminate and shall reattach once said condition is no longer breached.

[*Id.*, at ¶ 15.] The policy also contains a Held Covered Clause, which states:

> The vessel is held covered in case of any breach of conditions as to * * * locality * * * provided (a) notice is given to the Underwriters immediately following receipt or knowledge thereof by the Assured and (b) any amended terms of cover and any additional premiums required by the Underwriters are agreed to by the Assured.

[34, at ¶ 22.]

### B. The Underlying Action

In 2015, the vessel was docked during the summer months in its home port of Chicago's 31st Street Harbor. [*Id.*, at ¶ 27.] On August 1, 2015, the vessel went on a paid excursion in Lake Michigan. The vessel left 31st Street Harbor and sailed north to Chicago's Navy Pier. [*Id.*, at ¶ 28.] Anthony LaHaie was the captain of the vessel for the trip, and Defendant Schulz, one of ACC's owners, was on board the vessel acting as a crew member. [*Id.*, at ¶ 29.] The vessel sailed back and forth between Navy Pier and the Shedd Aquarium and then headed south to return to 31st Street Harbor. [*Id.*, at ¶ 30.] LaHaie, with no objection by Schulz, sailed the boat south of 31st Street Harbor. [*Id.*, at ¶ 31.] The wind was strong and out of the northwest at 15–18 knots, and the vessel was headed south at a great rate of speed. [37, at ¶ 22; see also 37,

Exhibit E (LaHaie Deposition), at 49:15–50:12.] The "sea state was a light chop, 1–2 feet," and traffic was heavy. [37, at ¶ 22.] The vessel sailed approximately one mile south of 31st Street Harbor so that it could be turned into the wind, which served to slow the vessel down. [*Id.*, at ¶ 23.] The vessel was then heading northwest, in the general direction of 31st Street Harbor, when it became grounded on a shoal known as the Oakland Shoal, located one mile southeast of 31st Street Harbor. [37, at ¶ 32.]

Due to the grounding, Schulz contacted Great Lakes Repair, which provided assistance and a tow to 31st Street Harbor. [*Id.*, at ¶ 33.] Schulz expected an invoice for towing charges, but in early September 2015, he received a Great Lakes salvage bill in the amount of $200,000. [37, at ¶¶ 28–29.] Schulz denies that he ever agreed to a salvage contract with Great Lakes and was "shocked" at the amount of the bill. [*Id.*, at ¶ 29.] Schulz tried to negotiate a settlement with Great Lakes that would be in an amount under the policy's deductible but was unsuccessful. [*Id.*, at ¶¶ 29–30.] After failing to reach an agreement with Great Lakes for an amount within the policy deductible, Schulz submitted the claim to ACC's insurance broker DKS on October 6, 2015 ("the Great Lakes Claim"). [*Id.*, at ¶ 30.] Plaintiff subsequently received notice of the claim. [34, at ¶ 34.]

On October 12, 2015, Plaintiff agreed to investigate the Great Lakes Claim under a reservation of rights. [*Id.*, at ¶ 35.] On October 26, 2015, Great Lakes filed a lawsuit captioned *Great Lakes Repair, Inc. v. S/Y "Stars & Stripes"*, No. 15-CV-9506, in the Northern District of Illinois. [*Id.*, at ¶ 36.] Great Lakes alleged that it was entitled to payment of $200,000 for its effort in connection with the grounding and salvage of the vessel. On February 22, 2017, Judge Der-Yeghiayan granted Great Lakes' motion for default judgment against Schulz and ACC.

During its investigation of the Great Lakes Claim, Plaintiff learned that the vessel was

5

located one mile southeast of 31st Street Harbor when it grounded. [34, at ¶ 38.] Plaintiff subsequently disclaimed coverage because in its view, ACC was operating the vessel outside of the policy's specified navigation limits at the time of grounding. [*Id.*, at ¶ 39.] Plaintiff also filed this action seeking a declaration that the policy does not apply. Defendant Schulz and ACC filed a counterclaim seeking a declaration that the policy does apply, alleging breach of contract, and requesting sanctions under § 155 of the Illinois Insurance Code. The parties filed cross-motions for summary judgment [32] and [35], which are fully-briefed and currently before the Court.

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). However, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

This lawsuit invokes the Court's admiralty jurisdiction because it involves a marine policy. *Cont'l Cas. Co. v. Anderson Excavating & Wrecking Co.*, 189 F.3d 512, 517 (7th Cir. 1999) (noting that a suit for a declaration of rights under a "standard marine insurance policy"

was "comfortably within the admiralty jurisdiction, which extends to all contracts that have reference to maritime service or maritime transactions" (internal citations and quotation marks omitted)). Under admiralty jurisdiction, a marine policy is normally construed in accordance with state law, absent any rule of established federal admiralty law. *Perzy v. Intercargo Corp.*, 827 F. Supp. 1365, 1369 (N.D. Ill. 1993), as corrected (July 12, 1993).

The parties agree that absent any rule of established federal admiralty law, Illinois law applies here. [32, at 5.] Under Illinois law, an insured party bears the burden of proving that its claim falls within the insuring agreement. *The PrivateBank & Tr. Co. v. Progressive Cas. Ins. Co.*, 2004 WL 1144048, at *3 (N.D. Ill. May 18, 2004), aff'd, 409 F.3d 814 (7th Cir. 2005) (citing *Reedy Indus., Inc. v. Hartford Ins. Co. of Ill.*, 715 N.E.2d 728, 731–32 (Ill. App. Ct. 1999). Additionally, "[u]nder Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (citation and internal quotation marks omitted). The Court is to construe the policy terms and the allegations in the complaint in favor of the insured, and any doubts and ambiguities are resolved against the insurer. *Id.* at 811. "However, the general rules that favor the insured must yield to the paramount rule of reasonable construction which guides all contract interpretations." *Id.* (citation and internal quotation marks omitted).

### III. Analysis

Plaintiff argues that ACC breached the Navigation Condition by sailing the vessel outside of the navigation limits, and thus the policy does not cover any damage or loss due to the vessel's grounding. ACC, for its part, argues that it did not breach the Navigation Condition, and that even if there was a technical breach, the policy's Held Covered Clause overrides the

7

Navigation Condition such that coverage applies. The Court will address each argument in turn.

### A. Navigation Condition

The Navigation Condition states:

> It is hereby agreed that it is a condition of the policy that the insured vessel be confined to ten (10) miles North and five (5) miles East of 31st Street Harbor in Chicago, IL when vessels are operated May 1 to October 21 each year.
>
> * * *
>
> In the event of breach of any condition, coverage shall immediately terminate and shall reattach once said condition is no longer breached.

[34, at ¶ 15.]

When interpreting insurance contracts, the purpose is to give effect to the parties' intent. *Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 210 F. Supp. 2d 1017, 1022 (N.D. Ill. 2002). Any ambiguities in an insurance contract are interpreted in favor of the insured. *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995). A court may not, however, create an ambiguity when the language is clear and unambiguous. *Id.* If the words contained in the policy are unambiguous, a court must interpret them based on their "plain, ordinary, and popular meaning." *Knoll Pharm.*, 210 F. Supp. 2d at 1022 (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992)); see also *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006) ("If the words used in the policy, given their plain and ordinary meaning, are unambiguous, they must be applied as written."). Additionally, federal admiralty law requires the strict construction of express warranties in maritime insurance contracts. *State Nat'l Ins. Co. v. Anzhela Explorer, LLC*, 812 F.Supp.2d 1326, 1360 (S.D. Fla. 2011).

Here, the policy's navigation limits were clearly limited to "ten (10) miles North and five (5) miles East of 31st Street Harbor," which is what ACC requested in its application. It is

undisputed that when the vessel grounded, it was one mile southeast of 31st Street Harbor. Consequently, the grounding of the vessel occurred outside of the navigation limits. Once the navigation condition was breached, coverage terminated immediately, as indicated in the policy.

Defendants ACC and Schulz argue that a "fair and reasonable reading" of the policy would include in the navigation limits the area needed to safely maneuver the vessels in and out of 31st Street Harbor, instead of ending the navigation limits at the southern-most rock of the harbor wall. According to ACC and Schulz, the term "31st Street Harbor" is ambiguous and thus should be construed against the insurer and in favor of the insured. They argue that Weber, a managing partner of ACC and the individual primarily reasonable for arranging for ACC's marine insurance coverage, was only speaking in general terms when he answered ACC's insurance broker's questions about areas of operation. They point out that Weber testified that his answer—"we are looking at staying within five miles of shore during normal conditions from the north part of the city at about Irving Park Road all the way south to 31st Street Harbor" [37, at ¶ 10]—was meant to encompass the area of 31st Street Harbor, not to draw a hard line due east of the harbor's entrance. ACC and Schulz contend that "there can be no question that it must have been contemplated by the parties at the time the insurance contract was entered into that the vessels would remain covered when entering and exiting 31st Street Harbor where they were docked." [36, at 5.]

The Court disagrees that the term 31st Street Harbor is ambiguous and required to be interpreted in favor of the insured. An insurance policy provision is ambiguous "only if it is subject to more than one reasonable interpretation." *Atwood v. St. Paul Fire & Marine Ins. Co.*, 845 N.E.2d 68, 70 (Ill. App. Ct. 2006). It is not reasonable to interpret the term 31st Street Harbor as the southern boundary of the navigation limits to encompass some unspecified

distance south of 31st Street Harbor. Rather, the policy plainly and unambiguously required the vessel to remain ten miles north and five miles east of 31st Street Harbor for the insurance coverage to apply. ACC and Schulz's reading of the term 31st Street Harbor would essentially render the southern boundary of the navigation limits meaningless, as it would be unclear whether the vessel would be covered two, five, or even ten miles south of 31st Street Harbor, if the captain claimed to be maneuvering the vessel to return to the harbor. See *Pekin Ins. Co. v. Wilson*, 909 N.E.2d 379, 387 (Ill. App. Ct. 2009), aff'd, 930 N.E.2d 1011 (Ill. 2010) (explaining that courts will not "interpret an insurance policy in such a way that any of its terms are rendered meaningless or superfluous.").

ACC and Schulz also argue that 31st Street Harbor only opens to the south and that, by necessity, the insured vessels would require room to maneuver when entering or exiting the harbor. Defendants ACC and Schulz contend that reading the Navigation Condition as dictating a finite southern boundary of the navigation limits at the southern-most wall of 31st Street Harbor would render ACC's coverage illusory, since the vessel would sail in and out of coverage when entering and exiting 31st Street Harbor. To support this argument, ACC and Schulz emphasize that the policy also provides coverage at Crowley's Yacht Yard, which is located several miles south of 31st Street Harbor. In ACC and Schulz's view, the vessel would have coverage when sailing between 31st Street Harbor and Crowley's Yacht Yard because both points are specifically identified in the policy.

The Court does not find this this argument persuasive. Under Illinois law, an insurance policy is illusory only if "there is no possibility under any set of facts for coverage." *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp.*, 785 F. Supp. 2d 722, 735 (N.D. Ill. 2011) (citation and internal quotation marks omitted). An insurance policy does not need "to provide

coverage against all possible liabilities; if it provides coverage against some, the policy is not illusory." *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 841 N.E.2d 78, 86 (Ill. App. Ct. 2005), aff'd, 860 N.E.2d 280 (Ill. 2006). Here, the policy was not illusory because it clearly provided coverage to ACC when the vessel was within the navigation limits. If ACC wanted to have coverage when sailing south of 31st Street Harbor in order to enter and exit the harbor, instead of having 31st Street Harbor act as the southern boundary of the navigation limits, then ACC should have specifically requested this coverage area in its insurance application instead of describing its desired navigation limits "in general terms" and unreasonably expecting Plaintiff to provide more coverage than was specifically requested. The policy contains the exact navigation limits that ACC requested in its application for insurance coverage, which was submitted by ACC's insurance broker. And Plaintiff's underwriter reasonably relied on these navigation limits in investigating the hazards within the navigation limits that could increase the risk that Plaintiff would be insuring and in providing a quote of insurance. Thus, the navigation limits in the Navigation Condition must be enforced as written. See *Fenby v. M/V Tree D of Guernsey*, 217 F. App'x 846, 847 (11th Cir. 2007) (concluding that the navigation condition barred coverage because the term "Caribbean waters" was not ambiguous, and under its plain and ordinary meaning, it did not include waters immediately off the coast of Florida); *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988) (explaining that admiralty law requires the strict construction of express warranties in marine insurance contracts and that breach of the navigation warranty by the insured releases the insurance company from liability).[2]

---

[2] As Plaintiff recognizes, had the grounding incident occurred within the channel leading in and out of the harbor or within a reasonably plausible "room to maneuver" near the harbor entrance, this case would present different—and potentially much closer—questions of interpretation. For example, would it be plausible to consider the entrance or the channel part of the "31st Street Harbor"? But those questions are, as Plaintiff notes, "red herrings" because the factual predicate is missing, as the vessel was a mile south of the harbor when it went aground.

Additionally, the fact that coverage is provided at Crowley's Yacht Yard, which is south of 31st Street Harbor, does not save the day for ACC and Schulz. The policy states: "Wintered Condition: When vessels [sic] out of the water they are to be wintered at Crowley Yacht Yard 3434 East 95th Street, Chicago, IL 60617." The issue of whether vessels would be covered while sailing from 31st Street Harbor south to Crowley's Yacht Yard is not currently before this Court. However, the Court notes that coverage at Crowley's does not imply that coverage exists in Lake Michigan south of 31st Street Harbor, including one mile southeast where the grounding occurred (near a known hazard). Nothing in the record suggests that sailing the vessel to Crowley's was the only method of transporting the vessel there for winter storage. Plaintiff indicates that the vessel was originally transported from San Diego to Chicago by land, on a flatbed truck, and thus Plaintiff could have assumed that ACC intended to transport the vessel to and from its winter storage facility in the same manner, and consequently not operate outside of the navigation limits. Moreover, ACC also could have sought a trip endorsement to the policy to extend coverage to trips to and from the winter storage location if it intended to sail between 31st Street Harbor and Crowley's. Thus, the Court concludes that the policy's identification of Crowley's as the winter storage location does not change the plain meaning of the Navigation Condition.

In sum, the vessel was outside of the navigation limits when it grounded, and thus ACC breached the Navigation Condition.

### B. Held Covered Clause

Next, Defendants ACC and Schulz argue that the Held Covered Clause provides coverage, even if there was a technical breach of the Navigation Condition. The Held Covered Clause provides:

> The vessel is held covered in case of any breach of conditions as to * * * locality
> * * * provided (a) notice is given to the Underwriters immediately following

receipt or knowledge thereof by the Assured and (b) any amended terms of cover and any additional premiums required by the Underwriters are agreed to by the Assured.

[34, at ¶ 22.] Held covered clauses "protect the owner of the vessel from the harsh result of inadvertent failure to comply with specified warranties of the policy." *Campbell v. Hartford Fire Ins. Co.*, 533 F.2d 496, 497 (9th Cir. 1976). However, a held covered clause can only apply if the insured's breach of a condition was not willful. *Fenby*, 217 F. App'x at 849; *Campbell*, 533 F.2d at 497 n.1. A willful breach of a navigation condition occurs when the insured knowingly and intentionally permits the vessel to travel outside of the navigation limits. See *Fenby*, 217 F. App'x at 849; *Campbell*, 533 F.2d at 497.

Here, ACC knew that the navigation limits in the policy were ten miles north and five miles east of 31st Street Harbor, as these navigation limits were requested by ACC in its insurance application. Additionally, ACC—with co-owner Schulz aboard—intentionally operated the vessel south of 31st Street Harbor, and thus outside of the specified navigation limits. ACC presents no evidence and does not claim that the vessel accidentally traveled south of 31st Street Harbor.

Defendants ACC and Schulz argue that any breach of the Navigation Condition was unintentional because at the time of grounding, the crew was trying to move the vessel back to 31st Street Harbor, where it was regularly docked and where coverage was intended. ACC and Schulz rely on *Anzhela Explorer*, 812 F.Supp.2d at 1362. However, this argument is misplaced. In *Anzhela Explorer*, the owners purchased the insured vessel in Ft. Lauderdale, Florida, but intended to use it for commercial operations off the coast of Louisiana, in the Gulf of Mexico. In the written insurance contract, the navigation limits were defined as "the Gulf of Mexico, not to exceed 100 miles offshore," but the loss at issue took place in Atlantic waters during the "maiden voyage" from Ft. Lauderdale to Louisiana. The court held that the insured did not breach the

navigational warranty because it had negotiated an oral contract, in addition to the written insurance contract, for coverage for the initial voyage from Ft. Lauderdale to Louisiana. 812 F.Supp.2d at 1362. The court then explained, in dicta, that even if the navigational warranty in the written contract did apply, it would not void coverage because of the Held Covered clause. In the court's view, the breach was an inadvertent violation because it occurred during the owner's attempt to transport the vessel to the location where the coverage was intended, and the insurer had to expect the vessel to get to its original destination off the coast of Louisiana, in the Gulf of Mexico. *Id.* at 1362–63.

ACC argues that it was similarly attempting to move the vessel to its home port of 31st Street Harbor, and thus the Held Covered Clause should apply. However, *Anzhela Explorer*, 812 F.Supp.2d at 1362–63, can be distinguished. *Anzhela Explorer* involved a one-time trip to transport a vessel from its place of purchase to its intended coverage area. ACC's theory, in contrast, is that the Held Covered Clause would work to extend coverage each and every time ACC sailed the vessel south of 31st Street Harbor, as long as the vessel was in the process of returning to its home port. The situation at hand is thus factually distinct from the maiden voyage in *Anzhela Explorer*. Additionally, the Court notes that the dicta in *Anzhela Explorer*, 812 F.Supp.2d at 1362–63, is not binding on this Court.[3]

Finally, even if ACC had not willfully breached the Navigation Condition, the Held Covered Clause would not apply because ACC did not comply with the notice condition. The Held Covered Clause applies only if "notice is given to the Underwriters immediately following

---

[3] The Court also notes that the other cases cited by ACC and Schulz also can be distinguished. See *Hilton Oil Transport v. T.E. Jonas*, 75 F.3d 627, 630 (11th Cir. 1996) (concluding that there were genuine issues of material fact regarding whether the breach of the navigation limits was intentional); *Standard Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 59 F.Supp. 470, 474 (S.D.N.Y. 1945) (holding that the held covered clause applied where the insured was "forced" to take the vessel outside of the navigation limits after a German invasion "in order to protect the cargo and vessel from loss").

receipt or knowledge thereof by the Assured." [37, at ¶ 22.] Here, the vessel grounded on August 1, 2015, but ACC did not notify Plaintiff until October 6, 2015. This two-month delay means that notice was not provided "immediately," as required by the Held Covered Clause, nor was Plaintiff afforded any opportunity to assess amended terms or additional premiums, as contemplated by the policy language, before disaster struck.

ACC argues that it gave Plaintiff "timely" notice of the grounding of the vessel. Schulz explained in his deposition that although the vessel grounded on August 1, 2015, he did not give notice until October 6, 2015 because at the time of the grounding, he believed that the cost of the towing and assistance provided by Great Lakes would be well beneath the $20,000 deductible in the policy. However, in early September 2015, Schulz received an invoice from Great Lakes for $200,000. ACC and Schulz disputed the invoice and attempted to negotiate with Great Lakes, but when these efforts failed, ACC gave notice to Plaintiff. According to ACC and Schulz, this notice was "timely given the circumstances surrounding the invoice and services provided." However, the Held Covered Clause does not require "timely notice," but rather requires that notice be given "immediately." Thus, ACC did not comply with the unambiguous requirement of the notice condition, and the Held Covered Clause does not apply. Therefore, the policy does not provide coverage for the vessel's grounding outside of the navigation limits.

### C. ACC and Schulz's Breach of Contract Claim and Request for Sanctions under § 155 of the Illinois Insurance Code

ACC and Schulz argue in their counterclaim that Plaintiff breached the insurance contract and that they are entitled to an award of damages and attorney's fees under § 155 of the Illinois Insurance Code as a result of Plaintiff's "unreasonable and vexatious delay in settling its claim" for the grounding of the vessel. However, since the Court already has concluded that the policy does not provide coverage here, ACC and Schulz's breach of contract claim and request

for sanctions must fail.

**IV.     Conclusion**

For the reasons stated above, the Court grants Plaintiff's motion for summary judgment [32] and denies Defendant's motion for summary judgment [35].  The Court will enter a final judgment and close the case.


Dated: August 17, 2017

Robert M. Dow, Jr.
United States District Judge